IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LESLIE VENUS,** | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **Civil No. 09-956-WDS-CJP** |
| **MICHAEL J. ASTRUE,** **Commissioner of Social Security,** | ) ) ) | |
| Defendant. | ) ) | |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge William D. Stiehl pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Leslie Venus seeks judicial review of the final agency decision finding that she is not disabled and denying her Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.

## Procedural History

Plaintiff filed an application for SSI on October 26, 2005. The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Sherwin F. Biesman denied the application for benefits in a decision dated June 30, 2009. (Tr. 9-13). Plaintiff's request for review was denied by the Appeals Council, and the June 30, 2009, decision became the final agency decision. (Tr. 1-3).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

-1-

(1) Whether the ALJ erred in making his findings as to plaintiff's Residual Functional Capacity by failing to give sufficient weight to the opinion of her treating doctor, Dr. Thomas.

(2) Whether the ALJ erred in rejecting depression, anxiety and bipolar disorder as severe impairments and failing to assign limitations arising from those conditions.

(3) Whether the ALJ erred in rejecting plaintiff's right wrist condition as a severe impairment, failing to assign limitations arising from that impairment, and failing to assess her ability to lift.

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.** **Medical Records**

Ms. Venus alleges that she is disabled due to a right wrist condition and mental impairments.

The earliest medical record is a report of a consultative psychological examination done by M. Ballesteros, Ph.D., on October 6, 2003. This examination was done in connection with a prior application for benefits. The ALJ noted that the most recent of Ms. Venus' prior applications had been denied as of August, 2004. (Tr. 9). In October, 2003, Ms. Venus told Dr. Ballesteros that she had been in special education classes in school and had dropped out in the 9th grade when she became pregnant. She had 3 children with her fiancé of 9 years. Her right wrist was injured in a car accident in 2000. She had 2 surgeries, in 2000 and 2002, but she said that her wrist had never healed right. She complained that her wrist joint "pops out" and cramps up if she uses it much. At the time of the second surgery, she was working at a Gilster flour factory. She was pregnant at that time, and took maternity leave, and had not worked since. Dr. Ballesteros did IQ testing which showed Ms. Venus to be in the upper limits of the borderline

range of intellectual functioning. He noted that she had limited motion in her right hand. (Tr. 115-117).

The medical records reflect only one doctor visit for treatment to the right wrist. On October 25, 2005, plaintiff was seen by Dr. Bassman for complaints of swelling and intermittent aching in her right wrist. The diagnosis was degenerative joint disease of the wrist. Dr. Bassman prescribed medication. (Tr. 118).

Vittal Chapa, M.D., examined plaintiff on March 9, 2006. She was 26 years old with a ninth grade education. She was 66" tall and weighed 217 pounds. She gave a history of having had 2 surgeries on her right wrist, with the insertion of pins. She also stated that she also had "a problem with nerves" and did not like to go anywhere. Examination of the right wrist showed surgical scars. She had "slightly decreased range of motion of the right wrist." Dr. Chapa stated that the wrist joint "seemed quite stable." Ms. Venus had good hand grip on both sides, and was able to perform both fine and gross manipulations with both hands. Range of motion testing showed that her right wrist lacked 20 degrees of flexion in both directions. She had normal upper extremity strength on both sides, and full range of motion of both shoulders and elbows. (Tr. 120-126).

On April 13, 2006, Harry J. Deppe, Ph.D., performed a psychological evaluation at the request of the Bureau of Disability Determination Services. (Tr. 127- 130). She denied any history of mental health treatments. She noted that she had "some friends," but that she mostly stayed home with her children. Ms. Venus told Dr. Deppe that she was unable to work because of soreness in her right wrist. She said that she had last worked in a factory in 2001, but she went on maternity leave and hurt her wrist, and was unable to work after that. She told Dr. Deppe that she spent her time "taking care of her children, doing housework and cooking." On examination, her mood and affect were within normal limits. Her responses to questions were

coherent and relevant, and she showed no difficulty in staying on task. Her memory for recent and remote events was good, and her fund of general knowledge was within normal limits. Her judgment and insight were good. Dr. Deppe rated her ability to relate to others, to understand and follow simple instructions, to maintain attention required to perform simple, repetitive tasks, and to withstand the pressures and stress of day-to-day work activity as "Intact."

On April 14, 2006, Donald Henson, Ph.D., completed a psychiatric review technique form. (Tr. 131- 143). He reviewed Dr. Deppe's report. He concluded that she did not have a severe mental impairment. Her only impairment was noted to be high borderline intellectual functioning. She was assessed only mild limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. He noted that her activities were primarily limited by her physical condition.

On April 17, 2006, a state agency physician evaluated plaintiff's RFC, and concluded that she had no functional limitations and that her impairment was non-severe. The state agency physician referred to Dr. Chapa's findings, noting that she was able to perform fine and gross manipulation, had good hand grip bilaterally, and that, while she did have a slight decrease in the range of motion of the wrist, her joint appeared stable. (Tr. 145-152).

One month after Dr. Deppe's examination, Ms. Venus began seeing V. Jose Thomas, M.D, for mental health treatment. (Tr. 169). She complained of depression and insomnia, and stated that she was paranoid about something happening to her 3 children. She described anxiety and daily episodes of depressed mood. She also had daily obsessive compulsive disorder symptoms. She denied prior psychiatric treatment, but said that she was taking Ativan, which did not help. In the past, she had taken Zoloft, which also did not help. On exam, she was friendly and fully communicative, with normal speech and intact language skills. She had signs of moderate depression and anxiety, with a racing mind. Dr. Thomas diagnosed bipolar disorder

and general anxiety disorder, and prescribed Lamictal and Risperdal. (Tr. 170).

Ms. Venus continued to see Dr. Thomas monthly through November, 2007. (Tr. 157-168, 171-177). On May 8, 2007, she said that she thought someone was stalking her, and she felt paranoid. She described chronic anxiety symptoms. On exam, her mood was "entirely normal with no signs of depression or mood elevation." She did have signs of anxiety, but no signs of hyperactive or attentional difficulties. There were no indications of psychotic process. Her thinking was logical and her thought content was appropriate. She was told to continue taking Lamictal, Abilify, Ativan and Wellbutrin. (Tr. 177). On that same date, Dr. Thomas completed a medical source statement form. (Tr. 153-155). He opined that she had poor or no ability to deal with the public or to deal with work stresses, and only fair ability to follow work rules, relate to co-workers or supervisors, function independently or maintain attention and concentration. He assessed her ability to understand, remember and carry out both simple and detailed job instructions as fair, and stated that she had poor or no ability with respect to complex instructions. For "medical/clinical findings that support this assessment," Dr. Thomas wrote subjective statements that had been made by Ms. Venus.

On November 5, 2007, Dr. Thomas noted that she had signs of moderate depression, increased worrying and anxiety. He discontinued Ativan, and started her on Xanax. (Tr. 171). On November 14, 2007, Dr. Thomas affirmed that her limitations remained the same as he had stated in his May 8, 2007, medical source statement. (Tr. 156).

The next record from Dr. Thomas' office is dated October 30, 2008. She was taking Abilify, Lamictal, Wellbutrin and Xanax, all prescribed by Dr. Thomas. She complained of shaking for the past week with chest pain, and that she "freaks out during the holidays." The diagnosis on that date was generalized anxiety disorder. (Tr. 183). On December 9, 2008, she had persistent complaints of anxiety and depression and said that small things turn into big

things. She was described as "miserable," but her speech was clear and spontaneous with normal flow of ideas and no abnormal thought patterns or perceptual aberrations. Her insight and judgment were intact. Her intellectual functioning was average, with intact memory and cognitive skills. (Tr. 182). A month later, she continued to complain of anxiety and constant worrying, with her mind racing with inability to stop thinking about trivial things. Dr. Thomas assessed her as "partially improved" and instructed her to return in 4 weeks. (Tr. 181). This is the last record of treatment from Dr. Thomas. The hearing was held the next month.

**2.     Evidentiary Hearing**

The evidentiary hearing took place on February 17, 2009. Plaintiff was represented by attorney Scott Dixon. (Tr. 39).

Plaintiff was the only witness at the hearing. She testified that she was single and had 3 children, who lived with her. (Tr. 25). She last worked in June of 2001, at the Gilster-Mary Lee factory. Her job consisted of stuffing noodles into boxes. She worked there for 2 years. She left that job because she was unable to do it after she hurt her wrist in a car accident. She was unable to move her hands the way she needed to. (Tr. 26-27).

Ms. Venus testified that she had been referred to Dr. Thomas by her family doctor. During their monthly visits, he talks to her a little bit and gives her prescriptions for her medications. She takes 4 medications, which help, but she feels she cannot go back to work due to panic attacks. (Tr. 27-28).

During a panic attack, plaintiff's chest gets tight, her head gets "fuzzy and dizzy," her hands sweat, and she feels like she is going to pass out. This happens twice a week. (Tr. 28). She has had panic attacks at home, but they are worse if she goes out in public. (Tr. 29). She has crying spells along with the panic attacks. The medications have reduced the frequency of panic attacks. The side effects are dry mouth and tiredness. (Tr. 30).

Ms. Venus testified that her mother helps with her housework. She usually goes back to bed after her children leave for school, and sleeps until noon. Her mother also helps with her children. (Tr. 31).

Being around numbers of people, more than 5 or 6, causes her panic attacks. (Tr. 32).

Plaintiff still has a relationship with the father of her children, but they do not live together. (Tr. 32).

The record was held open for additional psychological testing after the hearing. (Tr. 33).

**3.**     **Post-Hearing Testing**

James S. Peterson, Ph.D., evaluated plaintiff on March 24, 2009. He reviewed Dr. Deppe's report and the records of Dr. Thomas, interviewed Ms. Venus, and administered an IQ test. The test results were Full Scale IQ of 83, which is in the low average range of intellectual functioning. Dr. Peterson stated that her raw score on the Beck Inventory was in the severely depressed category. He completed a mental RFC assessment form in which he assessed no restrictions in her ability to understand, remember and carry out simple instructions, or in her ability to make simple work-related decisions. She had only mild restrictions with respect to complex instructions and decisions. Based on her past diagnosis of bipolar disorder, he stated that, if she is symptomatic "very depressed or anxious," she would have marked impairment in her ability to interact with the public, supervisors, co-workers and to respond to usual work situations and changes in routine. When she is not symptomatic, her limitations are only mild. Based explicitly on Ms. Venus' own "self-report," he noted that jobs requiring reading or math would be limited by her poor skills. (Tr. 184 -189).

On May 18, 2009, Frank X. Kosmicki, Ph.D, performed a clinical interview and mental status examination, and administered the Test of Memory Malingering (TOMM). (Tr. 190-192). Ms. Venus told Dr. Kosmicki that her only real employment was doing factory work at a Gilster-

Mary Lee plant for about 2 years. She was unable to do that job after she broke her wrist in a car accident in 2000. She was a single parent who cared for 3 children, ages 13, 10 and 7. Dr. Kosmicki noted that she "shops, cooks, drives, does laundry, does household duties, and manages finances." (Tr. 190). He noted that previous testing showed her IQ was in the low average range, and she "endorsed symptoms of severe depression on the Beck Depression Inventory." (Tr. 190). Mental status testing showed that Ms. Venus was oriented in all spheres. She appeared to be depressed and anxious. Her speech was normal. She said she had problems with recent episodic memory and short term memory. She had no perceptual abnormalities. Her thought process was mostly logical, coherent and goal-directed. There were no indications of formal thought disorder. (Tr. 191).

Dr. Kosmicki administered the Test of Memory Malingering (TOMM). He explains in his report that this test "provides a systematic method to assist psychologists in discriminating between bona fide memory impaired patients and malingerers." (Tr. 191). After analyzing the test results, he concluded that Ms. Venus' results "raise serious concerns regarding [her] efforts" and that the findings "raise questions about the possibility of false or exaggerated claims of deficits in cognitive performance." (Tr 191). In his summary, he stated "Results suggest the possibility of poor effort, feigned impairment, and/or exaggeration of cognitive deficits." He also stated that he had not assessed whether she was exaggerating or feigning with respect to her psychiatric or emotional problems. (Tr. 192).

Dr. Kosmicki completed a mental RFC assessment form in which he assessed no restrictions in her ability to understand, remember and carry out simple instructions, or in her ability to make simple work-related decisions. She had only mild restrictions with respect to complex instructions, and moderate restrictions in ability to make complex work-related decisions. He noted that this assessment was based on her low average IQ, and that she had no

"salient symptoms of severe gross cognitive impairment." (Tr. 193). Based on her "mood symptoms," she had moderate impairment in her ability to interact with the public and supervisors, and mild impairment of her ability to interact with co-workers and to respond to usual work situations and changes in routine. (Tr. 194).

## Applicable Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala***, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.

See, **_Bowen v. Yuckert_, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** **_Knight v. Chater_, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether Ms. Venus is, in fact, disabled, but whether ALJ Biesman's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See, _Books v. Chater_, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing _Diaz v. Chater_, 55 F.3d 300, 306 (7th Cir.1995)).**

In reviewing for substantial evidence, this Court uses the Supreme Court's definition, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **_Richardson v. Perales_, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).** Further, the entire administrative record is taken into consideration, but this court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **_Brewer v. Chater_, 103 F.3d 1384, 1390 (7th Cir. 1997).**

## Analysis

Here, the ALJ properly followed the five step analysis. (Tr. 9-13). He concluded that plaintiff does have a severe impairment resulting from her low average to borderline intellectual functioning. He found that she did not have a severe impairment with respect to her right wrist or any mental impairment other than her level of intellectual functioning. He found that her impairment does not meet or equal a listed impairment. (Tr. 9-10). Ms. Venus does not challenge the finding that her condition does not meet or equal a listed impairment.

The ALJ found that plaintiff's testimony about the intensity, duration, and limiting effects of her symptoms was not entirely credible. He stated that "her overall credibility is

materially tainted by the results" of the TOMM administered by Dr. Kosmicki. (Tr. 10).

The ALJ gave more weight to the opinions of Drs. Deppe, Peterson and Kosmicki than to those of Dr. Thomas. The ALJ concluded that Ms. Venus has the RFC to perform a full range of work at all exertional levels, except that her intellectual functioning limits her to simple and repetitive tasks. He concluded that she has the capacity to perform her past factory work, and that she is, therefore, not disabled. (Tr. 10-12).

Plaintiff's first point is that the ALJ erred in assessing her RFC in that the ALJ improperly weighed the respective doctors' opinions. This is closely related to her second point, which is that the ALJ erred in rejecting the opinions of her treating doctor, Dr. Thomas, that she suffers from severe mental impairments.

A treating physician's opinion is, of course, not automatically entitled to controlling weight. Such an opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**

With regard to the assessment of treating source opinions, **20 C.F.R. §404.1527(d)(2)** states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [emphasis added]

The opinions of treating doctors "on the nature and severity of your impairment(s)" may be given controlling weight under Section 416.927(d). However, medical opinions of treating

doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that is reserved to the Commissioner. See, 20 C.F.R. §416.927(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2.

Based on the above authority, to the extent that plaintiff is complaining that the ALJ did not accept Dr. Thomas' assessment of her RFC, her argument must be rejected; RFC is an issue reserved to the Commissioner and a treating doctor's opinions with respect thereto are not entitled to any special significance. The state agency physician assessments and the reports of Drs. Deppe, Peterson and Kosmicki provide substantial evidence to support the ALJ's assessment of plaintiff's RFC.

Plaintiff argues that the ALJ should have accepted Dr. Thomas' opinion that she suffers from anxiety, bipolar disease and depression. The ALJ rejected Dr. Thomas' opinion as to the nature and severity of her impairments because his opinion was contradicted by other evidence in the record and was not well-supported.

The ALJ noted that much of Dr. Thomas' notes consists of recitation of plaintiff's subjective complaints, and that his notes reflect very little in the way of objective findings. Plaintiff argues that the ALJ overlooks the "objective mental status" portions of Dr. Thomas' records. She is incorrect. The ALJ recognized that Dr. Thomas did describe Ms. Venus as having "signs' of depression and anxiety, but, in reality, "the entries essentially relate these in terms of self-report, not observed abnormalities." (Tr. 11). Further, despite his diagnoses, Dr. Thomas assigned a GAF score of 65, which is in the range of mild symptoms or limitations.

-12-

DSM-IV-TR at 34. The ALJ also correctly noted that Dr. Thomas' records reflect improvement in Ms. Venus' condition by January, 2009. (Tr. 11).

Perhaps most importantly, the ALJ discounted Dr. Thomas' opinions because they were based largely on Ms. Venus' subjective complaints and self-reports, and the ALJ found that Ms. Venus has "major credibility problems." (Tr. 11). In addition to the results of the TOMM, the ALJ noted that Ms. Venus' statements were contradicted by her activities of daily living, the lack of medical treatment or strong pain medication for her wrist, and her conflicting explanations for why she left her job at Gilster-Mary Lee. These are proper considerations with respect to credibility. See, ***Castile v. Astrue*, 617 F.3d 923 (7th Cir. 2010)**. Plaintiff does not directly attack the ALJ's credibility findings, but she does argue that the ALJ should not have relied on the TOMM results in rejecting Dr. Thomas' opinions.

Plaintiff argues that the TOMM results could not possibly undermine Dr. Thomas' diagnoses of mental impairments because Dr. Kosmicki said that exaggeration with respect to psychiatric or emotional problems was not assessed. This argument misstates the ALJ's findings.

The ALJ did not state or imply that the TOMM results directly contradicted the validity of Dr. Thomas' diagnoses. Rather, the ALJ reasonably concluded that plaintiff's "overall credibility is materially tainted" by the fact that the TOMM results indicated she was exaggerating her symptoms. (Tr. 10). It was entirely reasonable for the ALJ to conclude that, if plaintiff exaggerated her symptoms in the area tested by TOMM, she probably also exaggerated her symptoms in the areas that were relevant to Dr. Thomas' treatment. Since Dr. Thomas' diagnoses rely so heavily on plaintiff's subjective statements, it was not unreasonable for the ALJ to discount his opinions.

Lastly, plaintiff argues that the ALJ erred in not assigning a severe impairment or any

functional limitations with regard to her right wrist. The ALJ did not err in this regard because the record contained very little evidence of any on-going wrist problems.

The claimant bears the burden of supplying adequate records and evidence to prove her claim of disability. See, 20 C.F.R. §404.1512(c) ( "You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). There was only one doctor visit for treatment to the right wrist, on October 25, 2005, and the diagnosis was degenerative joint disease of the wrist. (Tr. 118). Plaintiff relies on the record of M. Ballesteros, Ph.D., from October 6, 2003, but that evaluation took place 2 years before the alleged date of disability and was done in conjunction with a prior application that was denied. Further, the results of Dr. Chapa's examination and testing provide substantial evidence that Ms. Venus did not have a severe impairment or functional limitation with respect to her wrist. Dr. Chapa described the wrist joint as "quite stable" and observed that Ms. Venus had good hand grip on both sides and was able to perform both fine and gross manipulations with both hands. She lacked only 20 degrees of flexion in both directions on range of motion testing and she had normal upper extremity strength on both sides. (Tr. 120-126). Especially in view of the fact that Ms. Venus, who was represented by counsel, did not testify to any continuing problems with her wrist, the ALJ did not err in finding that she had no functional limitations with respect thereto. "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." **Glenn v. Secretary of Health and Human Services**, 814 F.2d 387, 391 (7th Cir. 1987).

## Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made.

Therefore, this Court recommends that the final decision of the Commissioner of Social Security, finding that plaintiff Leslie Venus is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **April 18, 2011.**

**Submitted: March 31, 2011.**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**